# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Criminal Action Number** |
| | ) | **18-00250-02-CR-W-HFS** |
| Pamela Michelle Alloway, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Presently pending before the Court are DEFENDANT'S MOTION TO SUPPRESS PHYSICAL

EVIDENCE [Doc. 38] and DEFENDANT'S MOTION TO SUPPRESS STATEMENTS [Doc. 39], filed by

defendant Pamela Alloway ("Alloway") on April 8, 2019.  On June 24 and September 9, 2019,

the undersigned held evidentiary hearings on Alloway's motions.  Alloway was present for both

hearings and was represented by her counsel, Kent Gipson.  The government was represented by

Assistant United States Attorney Robert Smith.  At the hearings, testimony was provided by

Alloway as well as Travis Cochenour, Ronald Long, and Jeremiah Bragg with the Nodaway

County (Mo.) Sheriff's Office.  Additionally, the following exhibits were admitted into evidence

| Number | Description |
|---|---|
| Gov't #1 | Photograph |
| Gov't ##2-3 | Search warrant affidavits |
| Gov't #4 | Body cam footage |
| Gov't #5 | Miranda waiver |
| Gov't #6 | Interview recording |
| Def't ##1-12 | Photographs |

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned recommends

denial of Alloway's motions and submits the following proposed findings of facts and proposed

conclusions of law.

1

# PROPOSED FINDINGS OF FACT[1]

1.        In April of 2018, Travis Cochenour and Jeremiah Bragg were road deputies with the Nodaway County, Missouri Sheriff's Office.  Tr.(I) at 3-4.

2.        In April of 2018, Ronald Long was a sergeant detective with the Nodaway County, Missouri Sheriff's Office. Tr.(I) at 21, 26.

3.        On April 1, 2018, Dep. Cochenour and Dep. Bragg were dispatched to the residence at 24794 350th Street in Barnard, Missouri, to assist Jennifer Rhoderic – an investigator with the Missouri Division of Family Services ("DFS") – who was performing a welfare check at the address based on a hotline call. Tr.(I) at 4-6, Tr.(II) at 5-6, 13-14, 47.

4.        Prior to arriving at the address, Ms. Rhoderic briefed the two deputies. Tr.(I) at 6.

5.        According to Ms. Rhoderic there was an allegation of drug activity in the home, verbal abuse of children, the presence of weapons, and that both adults living at the house were convicted felons. Tr.(II) at 18-19, 49.

6.        Upon arriving at the 350th Street address at 10:36 p.m., the two deputies and Ms. Rhoderic knocked on the front door and Alloway answered. Tr.(I) at 6, Tr.(II) at 19, 24.

7.        Ms. Rhoderic told Alloway that DFS had received some allegations and she needed to speak with Alloway's children. Tr.(I) at 6, Tr.(II) at 25, 51, 59.

8.        Alloway invited the two deputies and Ms. Rhoderic into the residence. Tr.(I) at 7, Tr.(II) at 25, 59.

9.        Ms. Rhoderic and Dep. Cochenour went into the house, while Dep. Bragg remained outside. Tr.(I) at 7.

10.        Upon entering the house, Dep. Cochenour observed multiple rifles ("long guns") leaned up against a door. Tr.(I) at 9, Tr.(II) at 30, 42.

11.        The guns were later identified as a .308 caliber Winchester rifle, a .243 caliber rifle, and a .22 caliber rifle. Tr.(I) at 9-10.

---

[1]        In making these findings, the Court has been required – in some instances – to make credibility determinations, particularly as they pertain to the officers' recitation of the facts surrounding interactions with Alloway on April 1, 2018, and Alloway's own testimony.  In making such determinations, the Court considered (1) the demeanor of the witnesses on the stand, (2) the interest the witnesses had in the outcome of the motion, and (3) the opportunity of the witnesses to hear, observe, and recall what was said or done.  In the end, the Court concludes that, in general, where there were conflicts, the officers were more credible witnesses.

12.     About 30 to 45 minutes after Dep. Cochenour arrived at the house, the father of Alloway's children – Richard Shane Culp – arrived at the residence. Tr.(I) at 12.

13.     Dep. Cochenour had a brief conversation with Mr. Culp and learned that Mr. Culp was a convicted felon. Tr.(I) at 12, Tr.(II) at 33.

14.     Mr. Culp also informed Dep. Culp that he had another gun in the safe in his bedroom. Tr.(I) at 13.

15.     However, Mr. Culp refused to unlock his gun safe for Dep. Cochenour. Tr.(I) at 13, II 44.

16.     Thereafter, Dep. Cochenour placed Mr. Culp under arrest. Tr.(I) at 13, Tr.(II) at 33.

17.     Dep. Cochenour had Dep. Bragg come into the house and take custody of Mr. Culp.  Tr.(I) at 14.

18.     Dep. Cochenour asked Alloway about the firearms in plain sight and Alloway acknowledged that she knew of their presence in the house. Tr.(II) at 6.

19.     Dep. Cochenour asked Alloway if she had had her gun rights restored and she said no.  Tr.(II) at 68.

20.     Alloway was placed under arrest.  Tr.(II) at 6-7.

21.     Dep. Cochenour then contacted the county prosecutor to request a search warrant for firearms in the safe of the residence.  Tr.(II) at 6, 7.

22.     While talking to the prosecutor's office on the telephone, Dep. Cochenour went up to the bedroom in the house so as to describe the safe for the affidavit being prepared in support of the search warrant. Tr.(I) at 7.

23.     In the bedroom, Dep. Cochenour saw in plain view two additional rifles.  Tr.(II) at 7-8.

24.     The next day, April 2, 2018, a Nodaway County judge issued a search warrant for the bedroom safe.  Tr.(II) at 8.

25.     The same day, Dep. Cochenour executed the warrant.  Tr.(II) at 9.

26.     The ensuing search of the safe revealed firearms as well as drug contraband consistent with methamphetamine.  Tr.(II) at 9-10.

27.     Later on April 2, 2018, Dep. Cochenour applied for and obtained a second search warrant to search the residence for controlled substances and related items.  Tr.(II) at 10.

3

28.     A second search led to the discovery of additional drug-related contraband. Tr.(II) at 11.

29.     On the afternoon of April 2, 2018, Det. Long conducted a 30-minute interview of Alloway in an interview room at the Nodaway County Sheriff's Office. Tr.(I) at 22, 26-27.

30.     Prior to the interview, Det. Long advised Alloway of her *Miranda* rights.  Tr.(I) at 22.

31.     Alloway acknowledged her rights and agreed to speak with Det. Long, signing a written waiver of *Miranda* rights. Tr.(I) at 23-25.

32.     At no point during the interview did Alloway invoke her rights and state that she did not want to speak any further. Tr.(I) at 27.

## PROPOSED CONCLUSIONS OF LAW

In her first-filed motion before the Court, Alloway asserts that the initial warrantless entry and search of the house at 24794 350th Street in Barnard violated the Fourth Amendment. That constitutional provision, of course, specifically provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ."  U.S. Const. amend. IV (*emphasis added*).  As made clear in the express language of the Fourth Amendment, the constitution does not forbid all searches and seizures, but only unreasonable searches and seizures. *Elkins v. United States*, 364 U.S. 206, 222, 80 S. Ct. 1437, 1446 (1960).  As protection for citizens from unwarranted government intrusion, the Fourth Amendment generally requires officers to obtain a court-sanctioned search warrant based on probable cause before searching private property. *See*, *e.g.*, *Shade v. City of Farmington, Minnesota*, 309 F.3d 1054, 1059 (8th Cir. 2000).

Nonetheless, in many search and seizure scenarios, the question of legal authority (as well as reasonableness) is presumptively satisfied by a judicially-issued warrant.  In this case, the

4

officers did not have a warrant to search the Richards' residence. In that regard, the Supreme

Court has cautioned:

> [S]earches conducted outside the judicial process, without prior
> approval by judge or magistrate, are *per se* unreasonable under the
> Fourth Amendment – subject only to a few specifically established
> and well-delineated exceptions.

*Arizona v. Gant*, 556 U.S. 332, 338, 129 S. Ct. 1710, 1716 (2009) (*quoting Katz v. United States*,

389 U.S. 347, 357, 88 S. Ct. 507, 514 (1967)).

It is well-established law that an exception to the warrant requirement of the Fourth

Amendment is consent to search. *Florida v. Jimeno*, 500 U.S. 248, 250-51, 111 S. Ct. 1801,

1803 (1991). In a typical consent-to-search case, the touchstone in analyzing a motion to

suppress is whether the consent was voluntary. In broad strokes, consent to search is voluntary if

it is "the product of an essentially free and unconstrained choice by its maker . . . rather than a

product of duress or coercion, express or implied." *Schneckloth v. Bustamonte*, 412 U.S. 218,

227, 93 S. Ct. 2041, 2047-48 (1973). To assist a court in making this ultimate determination,

numerous factors relating to the person giving the consent and the environment surrounding the

consent have been articulated. For instance, with regard to a defendant who consents, courts

consider:

    (1)    the consenter's age;

    (2)    the consenter's general intelligence and education;

    (3)    whether the consenter was under the influence of drugs or alcohol;

    (4)    whether the consenter was informed of his *Miranda* rights prior to consent; and

    (5)    whether the consenter had experienced prior arrests so that he was aware of the protections the legal system affords to suspected criminals.

*United States v. Alcantar*, 271 F.3d 731, 737 (8th Cir. 2001).  With regard to the environment surrounding consent, courts will examine whether the person who consented:

(1)      was detained and questioned for a long or short time;

(2)      was threatened, physically intimidated, or punished by the police;

(3)      relied upon promises or misrepresentations made by the police;

(4)      was in custody or under arrest when the consent was given;

(5)      was in a public or secluded place; or

(6)      either objected to the search or stood by silently while the search occurred.

*United States v. Mancias*, 350 F.3d 800, 805 (8th Cir. 2003).

In this case, viewing the totality of the circumstances and the credible evidence, the Court concludes that Alloway consented to the entry of Ms. Roderic AND the two officers.  Moreover, the Court does not find that the consent was limited in scope with regard to locations or rooms within the residence.

As a consequence of the permissible warrantless entry into the residence, Dep. Cochenour's subsequent observation of the rifles leaning in one corner fall within the "plain view" exception of the Fourth Amendment.  The plain view doctrine allows officers to seize an object without a warrant if:

(1)      the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed,

(2)      the object's incriminating character is immediately apparent, and

(3)      the officer has a lawful right of access to the object itself.

*United States v. Collins,* 321 F.3d 691, 694 (8th Cir. 2003).  Similarly, Dep. Cochenour did not violate the Fourth Amendment when he observed additional firearms in plain view while he was

in the upstairs bedroom for the purpose of describing the safe for the affidavit in support of a search warrant.

Finally, the plain view doctrine also applies to Dep. Cochenour's observation of the suspected methamphetamine and drug contraband found inside the safe. At the time the contents of the safe were seen by Dep. Cochenour, he was executing a judicially-authorized search warrant (*i.e.*, Dep. Cochenour was not violating the Fourth Amendment in looking into the safe from which the drugs could be seen).

In her second motion to suppress, Alloway also challenges the legality of the statements obtained from her by law enforcement officers, arguing that such statements were procured in violation of the Fifth Amendment. That amendment to the United States Constitution commands that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. With regard to the Fifth Amendment, the Supreme Court has found:

> The essence of this basic constitutional principle is the requirement that the [government] which proposes to convict and punish an individual produce the evidence against him by the independent labors of its officers, not by the simple, cruel expedient of forcing it from his own lips.

*Estelle v. Smith*, 451 U.S. 454, 462, 101 S. Ct. 1866, 1872 (1981). However, as the Supreme Court has made clear on numerous occasions, the right against self-incrimination does not prohibit any and all statements made by suspects to law enforcement officers from being admissible in a criminal proceeding. For example:

> [The Fifth Amendment] does not preclude a witness from testifying <u>voluntarily</u> in matters which may incriminate him, . . . for those competent and freewilled to do so may give evidence against the whole world, themselves included. . . . Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable.

*United States v. Washington*, 431 U.S. 181, 186-87, 97 S. Ct. 1814, 1818 (1977) (*emphasis added*).  The touchstone of such Fifth Amendment analysis is voluntariness.  *Dickerson v. United States*, 530 U.S. 428, 434, 120 S. Ct. 2326, 2331 (2000) ("We . . . continue to exclude confessions that were obtained involuntarily.").

With regard to statements made by a suspect during custodial interrogation by law enforcement, the Supreme Court, in the landmark case of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966), enunciated a special test for ascertaining voluntariness.  The reason for such special treatment stems from the Supreme Court's recognition that custodial interrogations are inherently coercive.  *Dickerson*, 530 U.S. at 435, 120 S. Ct. at 2331; *New York v. Quarles*, 467 U.S. 649, 654, 104 S. Ct. 2626, 2630 (1984).  Indeed, in *Miranda,* the Supreme Court observed that custodial interrogations, by their very nature, generate "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."  *Miranda*, 384 U.S. at 467, 86 S. Ct. at 1624.  Consequently,

> To combat this inherent compulsion, and thereby protect the Fifth
> Amendment privilege against self-incrimination, *Miranda* imposed
> on the police an obligation to follow certain procedures in their
> dealings with the accused.

*Moran v. Burbine*, 475 U.S. 412, 420, 106 S. Ct. 1135, 1140 (1986). These procedures, now almost universally familiar, include fully apprising a suspect of the prosecution's intention to use his statements to secure a conviction and informing him of his rights to remain silent and to have counsel present if he so desires.  *Miranda*, 384 U.S. at 468-70, 86 S. Ct. at 1624-26.

Despite the inherently coercive nature of custodial interrogations, it is well settled that a criminal suspect may waive the rights contained in the *Miranda* warnings "provided the waiver is made voluntarily, knowingly and intelligently."  *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1628.

However, "[a] waiver of *Miranda* rights is invalid if, in the totality of the circumstances, the accused's will was overborne." *United States v. Holloway*, 128 F.3d 1254 (8th Cir.1997); *see also United States v. Caldwell*, 954 F.2d 496, 505 (8th Cir.1992) (waiver of *Miranda* rights is determined under totality of the circumstances and in light of entire course of police conduct).

In *United States v. Boyd*, 180 F.3d 967 (8th Cir.1999), the Eighth Circuit explained how to determine whether a waiver of *Miranda* rights is valid:

> The determination of whether an accused has knowingly and voluntarily waived his *Miranda* rights depends on all the facts of each particular case. The circumstances include the background, experience, and conduct of the accused. The government has the burden of proving that the defendant voluntarily and knowingly waived his rights.

*Id*. at 977 (*internal citations omitted*); *see also United States v. Barahona*, 990 F.2d 412, 418 (8th Cir.1993) (government bears burden of proving by preponderance of evidence that defendant knowingly, voluntarily, and intelligently waived his rights).

Thus, an inquiry into whether a suspect's *Miranda* rights have been waived "has two distinct dimensions." *Moran*, 475 U.S. at 421, 106 S. Ct. at 1141. The Court has explained:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Id*. at 421, 106 S. Ct. at 1141. The *Moran* court further noted that "[o]nly if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id*. (*quoting Fare v. Michael C.*, 442 U.S. 707, 725, 99 S. Ct. 2560, 2571 (1979)).

9

These principles subsequently have been summarized by lower courts. For instance in *Holman v. Kemna*, 212 F.3d 413 (8th Cir. 2000), the Eighth Circuit found:

> A waiver is voluntary if it is the product of a free and deliberate choice rather than intimidation, coercion, or deception. A waiver is knowing and intelligent if it has been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Id.* at 420.

In this case, the Court has carefully reviewed the evidence and the recording of Alloway's interview with Det. Long. The government has produced sufficient evidence that Alloway voluntarily waived her rights and freely spoke to the officer without the benefit of the presence of counsel. There is no evidence before the Court tending to show that Alloway was in any way impaired or that officers threated, coerced, or intimidated Alloway. The dispositive issue before the Court is whether Alloway's waiver of her rights was voluntary. Based on the record before the Court, it was. Alloway's statements made in her post-arrest interview – including any inculpatory statements – are not subject to suppression.

Although Alloway's Fifth Amendment motion appears to be directed primarily toward the statements made to Det. Long, one additional statement is seemingly at issue as well. Following the plain view observation of the guns and the arrest of Mr. Culp, Dep. Cochenour apparently asked Alloway (1) if she knew there were guns in the house, and (2) if she had had her gun rights restored (following her prior felony conviction). At the time of this questioning, it appears that Dep. Cochenour had made the decision to arrest Alloway (*i.e.*, she would not have been free to leave). Moreover, both questions seemed designed to determine if Alloway was a felon in possession. Under these facts, this questioning of Alloway should have been preceded by an advisement of *Miranda* rights. Since it was not, Alloway's responses must be suppressed.

10

However, that finding does not mean there should be suppression of the evidence seized nor the subsequent post-*Miranda* statements.  The evidence establishes that Dep. Cochenour knew Alloway was a felon prior to arriving at the residence and, at the time the statements were made, Dep. Cochenour intended to arrest Alloway.  The Court concludes that regardless of the questions put to Alloway and regardless of the answers Alloway gave, Dep. Cochenour – given the plain view of the guns and his knowledge of Alloway's prior felony – would have arrested Alloway and would have sought and obtained the two search warrants.  *Compare United States v. Villalba-Alvarado*, 345 F.3d 1007, 1019 (8th Cir. 2003) (*citing Nix v. Williams,* 467 U.S. 431, 104 S. Ct. 2501 (1984)) (setting out the test for inevitable discovery).

Furthermore, even setting aside any issues of inevitable discovery, the Court concludes that the issuance of the judicially-authorized search warrants and Alloway's subsequent post-*Miranda* statement effectively purge the taint of any potential prior constitutional violation.  *Compare United States v. Whisenton*, 765 F.3d 938, 941 (8th Cir. 2014).

Accordingly, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** both the DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE [Doc. 38] and the DEFENDANT'S MOTION TO SUPPRESS STATEMENTS [Doc. 39], filed by defendant Pamela Alloway.

Counsel are reminded that each has 14 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same.  A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

*/s/ John T. Maughmer*

**John T. Maughmer**
**United States Magistrate Judge**

12